
**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>BRUCE ELIEFF,<br>      Debtor. | BAP No.  CC-21-1081-SFL<br><br>Bk. No. 8:19-bk-13858-ES |
| TODD KURTIN,<br>      Appellant,<br>v.<br>HOWARD M. EHRENBERG, Chapter 7<br>Trustee,<br>      Appellee. | Adv. No. 8:19-ap-01205-ES<br><br>**OPINION** |

Appeal from the United States Bankruptcy Court
for the Central District of California
Erithe A. Smith, Bankruptcy Judge, Presiding

APPEARANCES:

Daniel Luke Geyser of Haynes and Boone, LLP argued for appellant; Sean A. O'Keefe of O'Keefe & Assoc. Law Corp., P.C. argued for appellee.

Before: SPRAKER, FARIS, and LAFFERTY, Bankruptcy Judges.

SPRAKER, Bankruptcy Judge:

## INTRODUCTION

Creditor Todd Kurtin appeals from the entry of summary judgment in favor of chapter 7[1] trustee Howard M. Ehrenberg subordinating Kurtin's

---

[1] Unless specified otherwise, all chapter and section references are to the

1

claim under § 510(b). After its initial ruling, the bankruptcy court entered an order clarifying that its ruling subordinated not only his claim but also his lien rights arising from the prepetition judgment liens he obtained against Elieff.

We agree with the bankruptcy court that Kurtin's claim for damages arises from the purchase or sale of a security, and § 510(b) required subordination of his claim and the associated lien rights. Accordingly, we AFFIRM.

## FACTS[2]

### A.    Kurtin's and Elieff's joint ventures.

Beginning in the early 1990s, Kurtin and Elieff, as equal partners, engaged in a series of real estate investment and development projects. Each project was owned and run through a separate business entity or collection of entities. Typically, Elieff and Kurtin used corporations or limited liability companies, but they also utilized limited partnerships (collectively, the "Joint Entities").

It is not clear whether their business relationship was a single partnership that engaged in multiple projects or a set of separate ventures.

---

Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] We exercise our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case and adversary proceeding. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

In his declaration opposing the Trustee's summary judgment motion, Kurtin referred to it as "an equal general partnership, based on an oral agreement." Elsewhere, however, Kurtin admitted that he and Elieff conducted their real estate investment and development business through the Joint Entities and that each of them as individuals formed and jointly owned the Joint Entities, rather than the partnership.

**B.    Kurtin's and Elieff's first round of state court litigation and the resulting Settlement Agreement.**

The relationship between Kurtin and Elieff began to deteriorate in the late 1990s. In 2003, Kurtin sued Elieff and his separately owned development entities. Kurtin asserted claims for breach of contract, breach of fiduciary duty, conversion, embezzlement, and constructive fraud, among others. In turn, Elieff counter-sued Kurtin and his separately owned development entities, stating causes of action similar to those Kurtin had asserted.

During this litigation (the "First Lawsuit"), the parties engaged in mediation and entered into a Settlement Agreement in 2005. The Settlement Agreement not only resolved the parties' existing disputes but also ended their business relationship. More specifically, the Settlement Agreement required Kurtin to transfer his interests in the Joint Entities to Elieff. In turn, Elieff agreed to indemnify Kurtin for any liabilities arising from the Joint Entities. In exchange for both the dismissal of his causes of action and the "sale" of his interest in the Joint Entities, Kurtin was to

3

receive from Elieff or the Joint Entities an aggregate of $48.8 million in "Settlement Payments." The Settlement Agreement broke the Settlement Payments into four installments: (1) $21 million by no later than August 19, 2005; (2) $1.8 million on January 2, 2006; (3) $13.1 million on or before June 30, 2006; and (4) $12.9 million on or before December 31, 2006. Elieff and the Joint Entities were jointly and severally liable for the first Settlement Payment. Only the Joint Entities were liable for the remainder of the Settlement Payments.

The Settlement Agreement did not allocate any specific portion of the Settlement Payments to either the release of Kurtin's claims or the sale of his interest in the Joint Entities. Rather, the Settlement Agreement, as well as Kurtin's subsequent litigation statements, all indicated that the resolution of disputes and the "buyout" of Kurtin's interests were indivisible.

Paragraph 14 of the Settlement Agreement contained two distinct provisions significant to the issues before us. The first granted Kurtin a security interest "in the projects owned by the Joint Entities" to secure their obligation to make the Settlement Payments.[3] The second and more important of the two provisions contemplated a safeguard for the source of funds from which Kurtin presumed the Settlement Payments would be

---

[3] Neither Elieff nor the Joint Entities ever executed the documents necessary to perfect these security interests.

4

made—the funds of the Joint Entities. This provision prohibited Elieff from taking any distribution from any of the Joint Entities to the extent that such distributions would prevent satisfaction of the obligation to make Settlement Payments.

## C. The default on the Settlement Agreement and the second round of state court litigation.

When the Joint Entities failed to pay the full amount of the third Settlement Payment and any of the fourth Settlement Payment, Kurtin was entitled to judgment in the First Lawsuit for the amount of the shortfall under the terms of the Settlement Agreement. Kurtin sought entry of judgment against the Joint Entities for roughly $22.5 million. But the trial court denied this relief because the Joint Entities were not parties to the First Lawsuit at the time the Settlement Agreement was entered into.

Kurtin sought and obtained arbitration under paragraph 15 of the Settlement Agreement. This paragraph permitted the arbitrator to supply essential terms to the Settlement Agreement to the extent either party subsequently asserted that the Settlement Agreement was missing material terms. The arbitrator ultimately determined that the Settlement Agreement should be deemed amended to include a term that, if the default in Settlement Payments was not cured by June 30, 2007, "Kurtin shall have the right to require Bruce Elieff to transfer to Kurtin or his designee by July 10, 2007, any and all of Elieff's right, title and interest—held directly or indirectly—in and to any or all of the Joint Entities . . . ." But Kurtin never

5

sought to enforce this new term of the Settlement Agreement. According to Kurtin, he suspected that by the time of the arbitrator's ruling the unencumbered assets and funds of the Joint Entities were grossly insufficient to satisfy the shortfall in Settlement Payments.

Instead, in December 2007, Kurtin sued Elieff and the Joint Entities, stating numerous causes of action ("Second Lawsuit"). Only the seventh cause of action for breach of contract is relevant to this appeal. In relevant part, Kurtin alleged that Elieff breached paragraph 14 of the Settlement Agreement by taking distributions from the Joint Entities, "which distributions prevented the payment of the settlement payments as required under the Settlement Agreement."

In May 2010, following a bifurcated trial, the jury returned a verdict in favor of Kurtin and against Elieff for breach of paragraph 14 of the Settlement Agreement in the amount of $24,411,433.86, and judgment was entered for that amount. A series of appeals and a new trial on the amount of Kurtin's damages ensued. Ultimately, in February 2020,[4] the state court entered its fifth amended judgment against Elieff for $33,892,117.62 based solely on his breach of the distribution restriction in the Settlement Agreement. Prior to Elieff's bankruptcy filing, Kurtin recorded abstracts of judgment against Elieff and two of his separate entities that the state court

---

[4] In December 2019, the bankruptcy court granted Kurtin relief from the automatic stay so that he could take further action with respect to his claim, including taking the steps necessary to obtain an amended judgment from the state court.

6

included as additional judgment debtors based on its finding that those two entities were Elieff's alter egos—Morse Properties, LLC ("Morse") and 4627 Camden, LLC ("Camden").

**D.     The bankruptcy filings and the subordination litigation.**

In October 2019, Elieff, Morse, and Camden each filed chapter 11 petitions. In February 2020, three additional Elieff-related entities filed chapter 11 petitions. In June 2020, the bankruptcy court substantively consolidated the cases and ordered the appointment of a chapter 11 trustee. In September 2020, the consolidated case was converted to chapter 7, and Howard Ehrenberg was appointed to serve as chapter 7 trustee.

In his schedules, as amended, Elieff listed roughly $13 million in real property and $260,000 in personal property. He disclosed numerous affiliated entities but listed their values as zero or unknown. As for liabilities, he listed $97 million in secured debt, including $35 million owed to Kurtin on his judgment liens, and roughly $300,000 in unsecured debt.

Within weeks of his bankruptcy filing, Elieff commenced an adversary proceeding against Kurtin. In December 2019, Elieff filed his second amended complaint ("SAC"), which stated subordination claims under § 510(b), claims for transfer of Kurtin's judgment liens to the estate under § 510(c)(2), and various avoidance claims. In January 2020, Kurtin moved to dismiss the SAC. Elieff countered in February 2020 with a summary judgment motion filed jointly with intervenor the Official Committee of Unsecured Creditors of Bruce Elieff.

The bankruptcy court heard and determined the motion to dismiss and held its initial hearing on the summary judgment motion. The court dismissed some of the avoidance claims with leave to amend. It also dismissed without leave to amend the § 510(c)(2) claims seeking to transfer the judgment liens to the estate. The court held that § 510(c)(2) did not apply to claims subordinated under § 510(b) and only applied to claims subordinated under § 510(c)(1). The court denied the remainder of the motion to dismiss. As for the summary judgment motion, the court granted Kurtin's Civil Rule 56(d) (applicable via Rule 7056) request for time to conduct discovery and continued the summary judgment hearing.

By the time the court held its continued hearing on the summary judgment motion, the case had been converted, and Howard Ehrenberg, the chapter 7 trustee, had become the plaintiff. At the conclusion of the hearing the court took the matter under submission. Kurtin then filed another Civil Rule 56(d) motion asking for more time to conduct discovery. Kurtin maintained that most of the rights and obligations exchanged under the Settlement Agreement had little or nothing to do with his transfer of his interests in the Joint Entities to Elieff. Kurtin advised that he intended to seek additional discovery to allocate the Settlement Payments between the transfer of his interest in the Joint Entities and other rights and obligations. As Kurtin reasoned, if he could prove that the value of the Joint Entities was less than Elieff's first $21 million Settlement Payment, then none of the other Settlement Payments had anything to do with the purchase or sale of

securities. But Kurtin never alleged that the Settlement Payments were allocable, and no evidence was submitted to suggest this. Nor did he argue that the Settlement Agreement contemplated that the first Settlement Payment specifically related to the transfer of Kurtin's interest in the Joint Entities.

**E.      The bankruptcy court's decision.**

In January 2021, the bankruptcy court issued a memorandum decision granting summary judgment on the § 510(b) claims for relief.[5] The bankruptcy court determined that the plain terms of the Settlement Agreement established that it involved the purchase and sale of the securities of Elieff's affiliates. The bankruptcy court particularly relied on the provisions concerning Kurtin's transfer of his interests in the Joint Entities as well as those that attempted to unwind Kurtin's involvement in and potential liability for the Joint Entities' business. As the bankruptcy court explained, "[t]he undisputed fact remains that the crux of the Settlement Agreement required Kurtin to transfer his interest in the Joint Entities in exchange for Settlement Payments." Section 510(b), therefore, applied even if some aspects of the Settlement Agreement did not directly relate to the purchase or sale of securities.

---

[5] In September 2020, the bankruptcy court entered a separate order in which it made numerous evidentiary rulings. The evidentiary rulings are addressed in the discussion to the extent they are relevant to our analysis and resolution of this appeal.

The court also denied Kurtin's supplemental Civil Rule 56(d) request. It concluded that even if the Settlement Payments could be partially allocated to aspects other than the transfer of Kurtin's interest in the Joint Entities, this would not constitute a material issue of fact that would preclude summary judgment. As the bankruptcy court reasoned, § 510 relief is triggered whenever there was "some nexus" or "causal relationship" between the claim and the purchase or sale of securities of the debtor or the debtor's affiliates. Even if precise allocation of the Settlement Payments were possible, it was immaterial as the trustee had established the requisite nexus under § 510(b) between the restriction on distributions from the Joint Entities, the unsatisfied Settlement Payment obligations, and Kurtin's transfer of his interest in the Joint Entities.

**F.    The parties' cross-motions seeking to clarify the court's ruling.**

After the memorandum decision, both sides requested modification of the court's ruling to clarify whether subordination was limited to just Kurtin's "claim," or included his judgment liens as well. After holding another hearing, the court entered an order stating that Kurtin's liens were subsumed within the term "claim" as used in § 510(b). As a result, the bankruptcy court concluded, Kurtin's judgment liens were subordinated for the same reasons and to the same extent that his claim had been subordinated by the court.

10

On April 5, 2021, the bankruptcy court entered final judgment pursuant to Civil Rule 54(b) on Ehrenberg's § 510(b) subordination claims for relief. Kurtin timely appealed.[6]

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Did the bankruptcy court err when it granted summary judgment in favor of Ehrenberg?

2. Did the bankruptcy court correctly construe § 510(b)?[7]

3. Did the bankruptcy court abuse its discretion when it denied Kurtin's supplemental Civil Rule 56(d) motion?

4. Did the bankruptcy court abuse its discretion when it excluded certain portions of Kurtin's evidence?

## STANDARDS OF REVIEW

We review the bankruptcy court's grant of summary judgment de novo. *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 230 (9th Cir. BAP

---

[6] The remainder of Ehrenberg's surviving avoidance claims for relief have been dismissed without prejudice.

[7] On appeal, Kurtin has not specifically and distinctly challenged the bankruptcy court's determination that his divestment of his interests in the Joint Entities constituted a purchase or sale of securities of the debtor's affiliates within the meaning of § 510(b). Consequently, he has forfeited any issues he might have raised related to this determination. *See Christian Legal Soc'y v. Wu*, 626 F.3d 483, 487–88 (9th Cir. 2010); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010).

11

2007), *aff'd in part, dismissed in part*, 551 F.3d 1092 (9th Cir. 2008). In conducting our de novo review, we must view the facts in the light most favorable to the nonmoving part, and we must determine whether the moving party was entitled to judgment as a matter of law because no genuinely disputed issues of material fact needed to be tried. *Id.*

We also review de novo the bankruptcy court's construction of the Code. *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014). De novo review means that we review the matter anew as if the bankruptcy court had not previously decided it. *Id.*

The denial of a Civil Rule 56(d) motion seeking more time to conduct discovery is reviewed for an abuse of discretion. *Atay v. Cnty. of Maui*, 842 F.3d 688, 698 (9th Cir. 2016). We also review for an abuse of discretion the bankruptcy court's exclusion of evidence. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). The bankruptcy court abuses its discretion if it applies an incorrect rule of law or its factual findings are illogical, implausible, or without support in the record. *TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

## DISCUSSION

### A. Kurtin's claim for breach of the Settlement Agreement falls within the broad scope of § 510(b).

Section 510(b) "mandates the subordination of damages claims arising from the purchase or sale of a security." *Am. Broad. Sys., Inc. v. Nugent (In re Betacom of Phx., Inc.)*, 240 F.3d 823, 827 (9th Cir. 2001) (internal

12

quotation marks omitted).[8] Its principal purpose is to ensure that creditors of the debtor are paid before disappointed equity interest holders who bargain for the potential of a greater return in exchange for a greater risk of loss. *Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*, 493 F.3d 1067, 1071-72 (9th Cir. 2007); Slain & Kripke, *The Interface Between Securities Regulation and Bankruptcy–Allocating Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973).

The Ninth Circuit broadly interprets the scope of § 510(b). *See Liquidating Tr. Comm. of the Del Biaggio Liquidating Tr. v. Freeman (In re Del Biaggio)*, 834 F.3d 1003, 1009 (9th Cir. 2016); *Pensco Tr. Co. v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 782 F.3d 492, 495 (9th Cir. 2015) ("*Tristar*"). Thus, the Ninth Circuit has held that a claim "arises from" the purchase or sale of securities whenever it shares a "nexus or causal relationship" with the purchase or sale of securities. *In re Del Biaggio*, 834 F.3d at 1009 (citing *In re Am. Wagering, Inc.*, 493 F.3d at 1072).

We see no material difference between *Tristar* and the instant case. In *Tristar*, creditor O'Donnell sought to withdraw as a member of the debtor limited liability company. 782 F.3d at 494. In response, Tristar invoked its right to purchase O'Donnell's membership interest, but the parties could

---

[8] Section 510(b) also applies to claims "arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor" and claims "for reimbursement or contribution allowed under section 502 on account of such a claim." But the bankruptcy court's ruling did not apply either of these aspects of § 510(b). There is no need for us to consider these other aspects of § 510(b).

not agree on a valuation of her interest. O'Donnell then initiated an arbitration and obtained an award which was reduced to judgment in state court. *Id.* Tristar then filed its chapter 11 bankruptcy petition and commenced an adversary proceeding to subordinate O'Donnell's claim under § 510(b) and (c). The bankruptcy court granted summary judgment in favor of Tristar on its § 510(b) claim. *Id.* Relying on its broad construction of "arising from," the Ninth Circuit affirmed. In the process, it rejected O'Donnell's contention that § 510(b) did not apply because the claim had been reduced to judgment and was a debt as of the petition date. *Id.* at 495-97. As the *Tristar* panel explained:

> [I]t is clear that O'Donnell's claim arises from the sale of a security of the debtor. Her claim originates from the failed sale of her membership interest and Tristar's breach of the operating agreement's provisions regarding repurchase of membership interests. The direct causal link between O'Donnell's claim and the purchase and sale of an equity interest leaves no doubt as to whether her claim for damages "flows from" the purchase or sale of a security of the debtor.

*Id.* at 497.

Similarly, Kurtin's claim originated from the failed Settlement Agreement pursuant to which he divested himself of his interests or rights in the Joint Entities. Kurtin has admitted these interests were worth millions of dollars at the time of the Settlement Agreement. Under the Settlement Agreement, the only significant consideration flowing to Kurtin was his right to receive the Settlement Payments. And the restriction in

14

paragraph 14 prohibiting Elieff from receiving distributions from the Joint Entities to the extent they interfered with the Settlement Payments indisputably was intended to protect and preserve the Joint Entities' funds necessary to make the Settlement Payments. Under these undisputed facts, Kurtin's claim based on Elieff's breach of paragraph 14 shares a direct causal link with the conveyance of his equity interests in the Joint Entities. Accordingly, the bankruptcy court correctly applied § 510(b) to Kurtin's claim.

**B.      None of Kurtin's arguments persuade us that the bankruptcy court erred in construing or applying § 510(b).**

**1.      *Khan* does not justify reversal.**

Citing *Khan v. Barton (In re Khan)*, 846 F.3d 1058 (9th Cir. 2017), Kurtin contends that § 510(b) does not apply because his claim arises from "Elieff's *post-settlement diversion of* [Joint Entity] *assets*," which has nothing to do with the sale of securities. Aplt. Opn. Br. at 37 (emphasis in original). In *Khan*, the creditor, Barton, obtained a state court judgment against the debtors for the fraudulent conversion of his stock in the debtors' affiliated entity. 846 F.3d at 1061, 1063-64. In their subsequent bankruptcy cases, the debtors sought mandatory subordination of Barton's proof of claim under § 510(b). *Id.* at 1062. The Ninth Circuit acknowledged the broad construction afforded § 510(b), but it reasoned that there was necessarily an outer limit to the scope of § 510(b) that "stops short of encompassing every transaction that touches on or involves stock in a corporation." *Id.* at 1064

15

(citing *In re Am. Wagering, Inc.*, 493 F.3d at 1071-73). According to *Khan*, the debtors' conversion of Barton's interest and the resulting damages had "nothing to do with his investment" in the entity except for the fact that his loss was measured by the value of his stock at the time the debtors converted it. *Id.* at 1064-65.

Kurtin argues that this case is analogous to *Khan* because his damages arose from Elieff's post-settlement misconduct, which occurred after the purchase of securities was complete. He contends that Elieff's conduct was too remote to trigger subordination under § 510(b). However, in *Khan* there was no connection between the debtors' conversion of Barton's stock and the earlier purchase of that stock. In contrast, by Kurtin's own admission, the purpose of paragraph 14's restriction on distributions from the Joint Entities was to protect and preserve the "income stream allocated to Kurtin" to ensure that all of the Settlement Payments were made. The Settlement Payments, in turn, were the only significant consideration flowing to Kurtin on account of his divestment of his interests in the Joint Entities. Unlike the conversion of the interests in *Khan*, Kurtin's judgment was based on Elieff's breach of the Settlement Agreement. As such, it shared a direct causal link to Kurtin's sale of his interests in the Joint Entities made in that very same agreement. Kurtin obviously expected to be compensated for these interests from the Joint Entities' cash. And the purpose of the distribution restriction in paragraph 14 was to protect and preserve that source of funds. Kurtin's claim arising

16

from the breach of the Settlement Agreement thus triggers § 510(b) because the claim originates or flows from his efforts to divest himself of his equity investment. *Tristar,* 782 F.3d at 497; *see also Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.),* 281 F.3d 133, 142 (3d Cir. 2002) (in affirming subordination of shareholders' claims for the debtor-corporation's **post-sale** breach of the stock purchase agreement, the court stated: "[m]ore important than the timing of the actionable conduct, from a policy standpoint, is the fact that the claims in this case seek to recover a portion of the claimants' equity investment.").

### 2. Kurtin's consideration under the Settlement Agreement cannot be apportioned between the securities-related and non-securities-related components.

Kurtin next argues that even if his judgment against Elieff is directly linked to the Settlement Payments, there is no link between the unpaid Settlement Payments and his sale of his interests in the Joint Entities. Though Kurtin admits that some amount of the Settlement Payments was meant to compensate him for his sale of his interests in the Joint Entities, he maintains that they also included compensation for other non-sale damages beyond the scope of § 510(b). Kurtin believes that the first Settlement Payment of $21 million fully paid the securities sale aspect of the Settlement Agreement. In support, he states that he only transferred his equity interest after Elieff made the first Settlement Payment. As a result,

he argues, the outstanding Settlement Payments cannot constitute damages that arise from the sale of his securities under § 510(b).

Kurtin has cited nothing in the record that evidenced, or even suggested, that the division or allocation of the Settlement Payments was a part of the parties' contract. To the contrary, the plain language of the Settlement Agreement reveals no distinction of purpose between any of the Settlement Payments. Moreover, nothing in the record remotely suggests that the Settlement Payments were severable rather than indivisible.

Undeterred, Kurtin asserts that the bankruptcy court still should have allocated the Settlement Payments between the securities sale and other damages. As Kurtin put it, "if those non-sale items were separated out into individual claims, there would be no basis for subordinating them under Section 510(b)." Kurtin cites *Betacom of Phoenix, Inc.*, 240 F.3d at 831-32, and *KIT digital, Inc. v. Invigor Grp. Ltd. (In re KIT digital, Inc.)*, 497 B.R. 170 (Bankr. S.D.N.Y. 2013), *as modified* (Dec. 2, 2013), in support of his position. But these decisions do not help Kurtin. Neither stands for the proposition that damages from a single indivisible contract can be apportioned between damages that trigger § 510(b) and those that do not.

California law applies, and it simply does not permit apportionment of cash consideration within a contract when the contract itself does not provide some basis or means for attributing consideration between the various items or services for which it was given. Absent such basis, the contract is indivisible, and the consideration cannot be apportioned. *See*

*Alderson v. Houston*, 154 Cal. 1, 9 (1908); *see also Keene v. Harling*, 61 Cal. 2d 318, 320 (1964) (stating that severing and apportioning a partially illegal contract only is permissible when the court can "reasonably relate the illegal consideration on one side to some specified or determinable portion of the consideration on the other side" in a manner that is "consistent with the intent of the parties"); *Perry v. Ayers*, 159 Cal. 414, 418 (1911) ("The purchase price was not apportioned to the various items of property, and there is no basis upon which this court can divide the purchase price, and say that any specific part of it was applicable to the stock of the Mother Lode Company and any other part to the interest in the Crystalline mine.").[9]

In sum, Kurtin failed to establish a genuine dispute that the Settlement Agreement permitted allocation of the Settlement Payments among the purchase and sale of securities and other non-securities related damages. The breach of paragraph 14 was directly linked to the obligation to make the Settlement Payments that arose, in part, from the purchase and sale of his securities. Kurtin expected to be paid from the source of funds

---

[9] Under California law, whether a contract is indivisible or severable largely depends on the contract's language and subject matter and like any question of contract interpretation must be answered based on the parties' intent. *Keene*, 61 Cal. 2d at 320; *Sterling v. Gregory*, 149 Cal. 117, 119–21, (1906). In turn, when considering the parties' intent for purposes of contract interpretation, it is their mutual intent as manifested in the contract and in their conduct that matters, not whatever subjective intent they harbored in their own minds. *Italiane v. Jeffrey Catanzarite Family Ltd. P'ship (In re Italiane)*, 632 B.R. 662, 674 (9th Cir. BAP 2021) (citing California cases).

that paragraph 14 was meant to protect. As such, **all** of the Settlement Payments were integral and indivisible consideration for the triggering securities sale. Under these circumstances, Kurtin's attempt to break the causal link between a portion of his claim and the sale of his interests in the Joint Entities must fail. That the Settlement Payments also resolved other disputes is immaterial because Kurtin failed to present any basis to treat the Settlement Agreement as severable. As a result, the bankruptcy court correctly determined that Kurtin's entire claim for breach of paragraph 14 "arose from" the sale of his interests in the Joint Entities for purposes of § 510(b). To hold otherwise would impermissibly read into the mandatory language of § 510(b) a requirement that the claim "solely" arise from the purchase or sale of securities. As the bankruptcy court correctly observed, § 510(b) contains no such requirement.

C. **Kurtin's liens were subordinated under § 510(b) for distribution purposes.**

Kurtin also contends that the bankruptcy court misinterpreted § 510(b) by applying it to his judgment liens. Kurtin admits that § 510(b) subordinates claims, including secured claims. But he maintains that § 510(b) has no effect on liens. According to Kurtin, subordination reprioritized Elieff's personal liability only. He contends that his secured claim remains entitled to the same priority it held prior to subordination. Because of this, he contends that the bankruptcy court erred when it subordinated the judgment liens that secure his claim.

20

1. **The structure and text of the Code do not bar the bankruptcy court's interpretation of § 510(b) as covering liens.**

The undisputed purpose of § 510(b) is to prevent an existing or former equity investor from sharing pari passu with the estate's creditors based on the attempted or consummated transmutation of its investment from equity to debt whether consensually or by a court ruling. *See, e.g.*, *In re Am. Wagering, Inc.*, 493 F.3d at 1071-72; *In re Betacom of Phx., Inc.*, 240 F.3d at 830. It also is undisputed that the scope of § 510(b) covers both secured and unsecured claims. § 101(5).[10] But Kurtin insists that § 510(b) does not cover liens because Congress only referenced "claims" in § 510(b) and did not mention "liens" in that subsection. We disagree.

a. **Section 510(b) subordinates the entirety of a claim including the creditor's *in rem* right to payment.**

As the bankruptcy court noted, Kurtin's narrow interpretation of § 510(b) is inconsistent with *Johnson v. Home State Bank*, 501 U.S. 78, 83-84 (1991), which held that the term "claim" as used in the Code includes mortgage liens. In *Johnson*, the Supreme Court examined the relationship between the underlying "claim" and the lien that secures repayment,

---

[10] This is consistent with Congress' understanding of pre-Code bankruptcy law. As reflected in the legislative history for § 510, Congress recognized that, "under existing law, a claim is generally subordinated . . . if . . . the claim itself is of a status susceptible to subordination, such as a penalty **or a claim for damages arising from the purchase or sale of a security of the debtor. The fact that such a claim may be secured is of no consequence to the issue of subordination.** 124 Cong. Rec. H11,095 (daily ed. Sept. 28, 1978) (remarks of Rep. Don Edwards), *as reprinted in* D Collier on Bankruptcy App'x Part 4(f)(i)(2) (16th ed. 2021) (emphasis added).

beginning with the statutory definition of "claim" as either an unsecured or secured right of payment or a right to an equitable remedy. § 101(5). The Supreme Court explained:

> A mortgage is an interest in real property that secures a creditor's right to repayment. But unless the debtor and creditor have provided otherwise, the creditor ordinarily is not limited to foreclosure on the mortgaged property should the debtor default on his obligation; rather, the creditor may in addition sue to establish the debtor's *in personam* liability for any deficiency on the debt and may enforce any judgment against the debtor's assets generally. A defaulting debtor can protect himself from personal liability by obtaining a discharge in a Chapter 7 liquidation. However, such a discharge extinguishes only the personal liability of the debtor. Codifying the rule of *Long v. Bullard,* the Code provides that a creditor's right to foreclose on the mortgage survives or passes through the bankruptcy.

*Johnson*, 501 U.S. at 82-83 (cleaned up).

*Johnson* proceeded to distinguish the two components of a secured claim: (1) personal liability dischargeable in bankruptcy; and (2) *in rem* liability that remains unaffected by a bankruptcy discharge. It concluded: "a bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam*—while leaving intact another—namely, an action against the debtor *in rem*." *Id.* at 84.

Section 510(b) mandates the subordination of the "claim" for damages arising from the sale of securities. This necessarily encompasses the entirety of Kurtin's "right to payment" whether personal or *in rem*. § 101(5). Thus, unlike a bankruptcy discharge, which only enjoins collection

22

of the *in personam* liability, subordination divested Kurtin of **any** right to payment from any means until the unsecured creditors are paid in full. As the bankruptcy court correctly pointed out, Kurtin retains his secured claim. Subordination simply rendered it junior to the interests of the unsecured creditors. And a lien is incident to the debt it secures. Cal. Civ. Code § 2909. Therefore, unless the unsecured creditors have been paid in full, Kurtin has no right to any repayment. If the unsecured creditors remain unpaid, Kurtin's judgment liens are simply wholly undersecured, valueless junior liens.

Viewed from another vantage, Kurtin's narrow reading of "claim" as used in § 510(b) would lead to incongruous if not absurd results that are wholly at odds with a contextual reading of the statute. The specific benefit of reordering priorities that § 510(b) confers on unsecured creditors would be nullified by Kurtin's reading of the statute. It would permit a former equity investor to elevate its lien rights ahead of the unsecured creditors § 510(b) was enacted to protect. Neither § 510(b) nor the Ninth Circuit's case law can be reconciled with this result. If obtaining a judgment for damages arising from the purchase or sale of securities does not remove that claim from § 510(b)'s purview, *Tristar*, 782 F.3d at 495-96, it makes no sense why recording that same judgment would have any greater effect. Indeed, *Tristar* evidently involved a claim secured by a judgment lien, *see id.*, and that fact did not alter the Ninth Circuit's subordination analysis.

In short, § 510(b) statutorily precludes Kurtin from collecting his damages until the unsecured creditors are paid. However one may choose to explain that result, it remains the same: satisfaction of Kurtin's right to payment on his underlying claim, whether deriving personally or *in rem*, is not statutorily permitted until all other claims are paid.

### b. Subordination of liens does not conflict with other provisions of the Bankruptcy Code.

Kurtin additionally argues that any interpretation of § 510(b) to include subordination of liens conflicts with both § 725 and § 510(c). Section 510(b) states that mandatory subordination is for "the purpose of distribution." Kurtin believes that subordination only affects distribution of the estate's property under § 726 and, therefore, cannot affect his liens. In Kurtin's view, his liens retain their prepetition priority, and the encumbered property must be "disposed of" pursuant to § 725 which provides:

> After the commencement of a case under this chapter, but before final distribution of property of the estate under section 726 of this title, the trustee, after notice and a hearing, shall dispose of any property in which an entity other than the estate has an interest, such as a lien, and that has not been disposed of under another section of this title.

According to Kurtin, there is a substantive difference between the estate's distribution under § 726, which specifically references § 510, and the disposition of encumbered property required by § 725, which does not.

24

As a result, Kurtin contends that subordination of his liens runs afoul of § 725.

Kurtin's reliance on § 725 is misplaced. Section 725 is one of the Code sections governing "distribution" of estate property. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 979 (2017) (citing both §§ 725 and 726 and stating that "**distributions** of assets in a Chapter 7 liquidation must follow this prescribed order" (emphasis added)); *see also* H.R. Rep. No. 95-595, 382-383, *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6338-39 (explaining that § 725—which grants bankruptcy courts broad and flexible authority to order "dispositions" of estate property in which third parties hold interests or liens—was enacted by Congress "in lieu of a section that would direct a **certain distribution to secured creditors**" (emphasis added)). As such, it is explicitly subject to the mandatory effect of subordination under the plain language of § 510(b).

More importantly, there is no conflict between § 510(b) and § 725. Section 725 only requires the trustee to dispose of any other entity's interest prior to the **final** distribution under § 726. There is no evidence in the record that the estate is ready for final distribution. Indeed, there is nothing in the record concerning the administration of this estate to implicate § 725 at all. Rather, it appears that the trustee sought subordination of Kurtin's liens so it could administer the property of the estate that the liens encumber. Presumably, Kurtin's liens precluded the estate from administering the estate's asset(s) under § 363(f). His subordinated liens are

25

now junior to the unsecured creditors' interests, and the estate will likely liquidate those encumbered assets under § 363(f) and § 506(d). Any encumbered proceeds from the liquidation of those assets would be distributed in satisfaction of § 725. Furthermore, an approved sale that did not pay the unsecured creditors in full would establish that the subordinated liens were worthless and effectively unsecured. If the estate does not administer the encumbered assets, they will be disposed of prior to the estate's final distribution under § 726. That is all that § 725 requires. There is nothing to suggest that subordinating his liens violates that statute.

Kurtin next points to § 510(c)(2) to support his argument that "claim" as used in § 510(b) should not be read to include liens. Section 510(c)(2) permits the court to exercise its discretion to **transfer** a lien to the estate under equitable subordination principles.[11] Kurtin theorizes that the reference to "claims" in § 510(b) should be narrowly construed to exclude "liens" because § 510(c) provides for separate treatment of "liens" and "claims" in the context of equitable subordination whereas § 510(b) does not. As Kurtin posits, if Congress wanted to cover liens for purposes of § 510(b), it obviously knew how to do so. And the absence of a provision

---

[11] Section 510(c) generally codifies the result in *Pepper v. Litton*, 308 U.S. 295 (1939), and similar pre-Code cases. H.R. Rep. No. 95-595, 359, as *reprinted in* 1978 U.S.C.C.A.N. 5963, 6315. *Litton* itself involved the subordination of a secured claim. *See* 308 U.S. at 312.

like § 510(c)(2) in § 510(b) is a strong indicator that Congress did not intend § 510(b) subordination to cover liens.

Kurtin's argument misses the point. Lien transfer is a remedy distinct from lien subordination. As explained above, lien subordination under § 510(b)—and § 510(c)(1)—is nothing more than a recognition of the well-established proposition that a lien is an incident of the debt, *Freeman v. Nationstar Mortg. LLC (In re Freeman)*, 608 B.R. 228, 235 (9th Cir. BAP 2019), and that once the claim has been subordinated, the lien automatically follows the debt. In contrast, the lien transfer relief provided for under § 510(c)(2) gives the estate the benefit of the lien right—including priority over intervening liens. Simply put, these two forms of lien relief are not mutually exclusive. And Congress's choice not to provide for lien transfer relief in conjunction with § 510(b) tells us little or nothing about its provision of lien subordination relief under both § 510(b) and (c).

In sum, none of Kurtin's arguments based on the text and structure of the Code persuade us that the bankruptcy court incorrectly interpreted § 510(b).

**2.** **The traditional and general treatment of liens in bankruptcy does not bar the bankruptcy court's interpretation of § 510(b) as covering liens.**

Kurtin insists that subordination of liens under § 510(b) also is inconsistent with the traditional and general protections that liens are afforded out of respect for the secured creditor's state law rights. Relying

on such venerable cases as *Dewsnup v. Timm*, 502 U.S. 410, 417 (1992), *Johnson*, 501 U.S. at 84, and *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 211–12 (1983), Kurtin points out that liens generally pass through bankruptcy unaffected, and when Congress has modified or impeded the exercise of lien rights, it typically strives to provide safeguards to protect their collateral from dissipation or devaluation, or it offers offsetting compensation to the extent the collateral is consumed.

However, Kurtin's argument regarding Congress's generally protective attitude towards lien rights ignores the fact that when Congress perceives a need and justification to affect such rights, it has done so. Merely within chapter five of the Code, there are numerous sections that can drastically affect lien rights. *See* §§ 506(c), 506(d), 522(f), 547, and 548. Based on our above analysis and construction, § 510(b) also affects lien rights. Based on our construction of § 510(b) as covering "liens," we reject Kurtin's argument founded on the Code's general practice of protecting and preserving lien rights.

### 3. Application of § 510(b) to Kurtin's lien rights did not violate his due process rights.

Similarly, Kurtin's constitutional argument is circular. Kurtin argues that the bankruptcy court should have eschewed a construction of § 510(b) that risks a determination that § 510(b) is unconstitutional. As Kurtin reasons, to the extent § 510(b) affects his lien rights, it constitutes an

28

unconstitutional taking of his property interests in violation of the Fifth Amendment.

Assuming without deciding that judicial liens constitute property interests subject to Fifth Amendment protection, Kurtin's constitutional argument still lacks merit. When Congress duly exercises its bankruptcy power to impair property rights granted under state law, and the enacted bankruptcy legislation pre-dates the parties' agreement, the limitations on the parties' property rights arising from the legislation become an implicit part of the parties' agreement. *See Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 516-18 (1938). Hence Congress's legislation does not violate either party's due process rights. *Id*.

Nor can there be any legitimate question that bankruptcy courts have the power to subordinate claims, and the appurtenant lien rights, regardless of state law. *See Litton*, 308 U.S. at 304-06, 312; *see also Fahs v. Martin*, 224 F.2d 387, 395 & n.5 (5th Cir. 1955) (citing *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 162-63 & n.5 (1946), and recognizing bankruptcy court's power and duty to subordinate certain claims).

Given our reading of § 510(b), the potential that a bankruptcy court might later subordinate any claims or liens arising from the Settlement Agreement was an implicit part of the contract between Kurtin and Elieff. As a result, we reject Kurtin's argument that his due process rights might have been violated as a result of the bankruptcy court's subordination of his liens under § 510(b).

**4.    Kurtin's liens were not extinguished as a result of the subordination, but his collateral can be consumed through distribution.**

Kurtin generally argues that subordination of his secured claim makes no sense because the court did not avoid his lien. He points out that the court took pains to articulate that his liens were not avoided but merely subordinated. He reasons that this necessarily means that his lien, and its priority, remain unaffected. Kurtin goes so far as to say that "if the trustee distributes that property [his collateral] to someone else, the property arguably remains subject to his lien." Accordingly, in his view, his lien rights would continue to exist in the same priority as prior to subordination even after that collateral is distributed to other creditors of Elieff's bankruptcy estate.

For the reasons previously discussed at length, subordination of Kurtin's claim was required under § 510(b). Subordination of the claim necessarily subordinated the associated liens securing the underlying claim. The court did not avoid the lien; it did not need to do so. Based on the bankruptcy court's decision, Kurtin holds a subordinated encumbrance junior to the unsecured creditors. His claim is not entitled to payment **from any source** until the unsecured creditors are paid in full. Kurtin's observations concerning lien avoidance are unfounded and do not establish any error in the bankruptcy court's decision.

**D.** **Kurtin's challenge of the bankruptcy court's denial of his supplemental Civil Rule 56(d) request and its evidentiary rulings do not justify reversal.**

Kurtin contends that the bankruptcy court committed reversible error by denying his supplemental Civil Rule 56(d) request. Kurtin maintains that he needed additional time to conduct discovery on two points. First, he stated that he needed additional time to discover facts regarding the value of the different types of consideration he gave under the Settlement Agreement. Kurtin particularly wanted discovery as to the value of the securities-sale component and the value of the dispute resolution component to allocate the Settlement Payments between those two components.

As we have explained above, the Settlement Agreement was an indivisible contract, its various components were not severable, and consideration could not be apportioned among them. Consequently, the valuation evidence was irrelevant to the bankruptcy court's summary judgment ruling. The valuation issue did not pertain to a genuine issue of "material" fact. For summary judgment purposes, a factual issue only is material if it could affect the outcome of the litigation under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Therefore, Kurtin's asserted need to discover valuation evidence was insufficient to support its supplemental Civil Rule 56(d) motion. *See Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell,* 138 F.3d 772, 779 (9th Cir. 1998) (holding that

a litigant seeking to extend discovery in the face of a pending summary judgment motion must show among other things that evidence the litigant seeks to discover is "essential" to opposing summary judgment).

The only other facts Kurtin sought to discover related to his belief that the sale of his equity interests in the Joint Entities occurred so long before the bankruptcy case that the causal nexus between his equity interest and the resulting debt had been negated. He claims he needed additional time to conduct discovery regarding the evolution of the Joint Entities' debt structure. The unstated conclusion Kurtin draws from these circumstances is that his equity to debt transmutation was so "old and cold" that creditors in existence at the time of Elieff's bankruptcy filing could not possibly have extended credit in reliance on the equity cushion his equity investments in the Joint Entities provided. However, creditor reliance on the equity cushion is only one of the two rationales for imposition of § 510(b) subordination. *See In re Am. Wagering, Inc.*, 493 F.3d at 1071-72 (explaining the two rationales underlying § 510(b)). The other rationale is the greater risk of loss investors assume when they invest in a business entity—as compared to the risk assumed by creditors. *See id.* Nothing that Kurtin has shown or argued suggests that the passage of time has impacted this risk-allocation rationale as it applies in this case.

The Ninth Circuit has made clear that the risk allocation rationale is the critical rationale for imposing § 510(b) subordination and that the creditor reliance rationale does not apply at all in the context of a sale of

securities by an affiliate of the debtor. *In re Del Biaggio*, 834 F.3d at 1011-12. Because Kurtin's "old and cold" argument only implicates the creditor reliance rationale, any evidence he sought to discover in support of that argument was not material to the plaintiffs' summary judgment motion.

As for excluded evidence, he mostly objects to the exclusion of evidence related to his already-discredited attempts to value and apportion the Settlement Payments. The only other evidence he argues that the bankruptcy court should not have excluded consisted of "direct evidence [in his declarations] of the purpose and intent of the Settlement Payments." But this evidence was also irrelevant. Kurtin's statements regarding his personal, subjective intent in entering into the Settlement Agreement is immaterial to the proper construction of the parties' mutually manifested objective intent in entering into the Settlement Agreement. *See In re Italiane*, 632 B.R. at 674.

In sum, Kurtin has not persuaded us that the bankruptcy court abused its discretion by denying Kurtin's supplemental Civil Rule 56(d) motion or by excluding certain parts of Kurtin's evidence.

## CONCLUSION

For the reasons set forth above, we affirm both the bankruptcy court's summary judgment in favor of Ehrenberg on his § 510(b) claims for relief and its subsequent order clarifying that its summary judgment ruling subordinated Kurtin's lien rights as well as his claim.